IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 30, 2021 Session

## STATE OF TENNESSEE v. TYLER WARD ENIX

**Appeal from the Criminal Court for Knox County**
**No. 107024   Steven Wayne Sword, Judge**

_____

### No. E2020-00231-CCA-R3-CD

_____

Tyler Ward Enix, Defendant, was indicted for three counts of first degree felony murder, one count of premeditated first degree murder, one count of especially aggravated robbery, one count of especially aggravated kidnapping, and one count of carjacking. The trial court dismissed the kidnapping and carjacking counts at the State's request. After a jury trial, Defendant was found not guilty of felony murder. The jury found Defendant guilty of first degree premeditated murder and especially aggravated robbery. After the jury deadlocked on a sentence for first degree murder, the trial court imposed a life sentence. After a separate sentencing hearing, the trial court ordered Defendant to serve a consecutive twenty-five-year sentence for especially aggravated robbery. The trial court denied a motion for new trial and this appeal followed. On appeal, Defendant raises the following issues: (1) the evidence was insufficient to support the convictions for first degree murder and especially aggravated robbery; (2) the State made improper statements during closing argument; (3) the State made improper statements during opening statements; (4) the trial court improperly admitted hearsay evidence; (5) the trial court abused its discretion in admitting multiple photographs of the victim's body; (6) the trial court erred by denying a motion for change of venue; (7) the trial court erred in refusing to give a definition of passion to the jury; and (8) cumulative errors  After a thorough review of the record and applicable authorities, we affirm Defendant's convictions and sentences.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Mark Stephens, District Public Defender; Jonathan Harwell (at trial and on appeal); John Halstead (at trial), District Public Defenders, Knoxville, Tennessee, for the appellant, Tyler Ward Enix.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; Kevin Allen and Molly Martin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury returned a multi count indictment of felony murder, premeditated first degree murder, especially aggravated robbery, especially aggravated kidnapping, and carjacking for Defendant's role in the death of his ex-wife Kimberly Enix.

At trial, 90-year-old Dorothy Graham testified that she was the victim's grandmother and that she "raised her" and put her through college. The victim became a social worker and married Chris Morrison in May of 2000 while she was still in college. The couple had two daughters. The victim and Mr. Morrison were divorced in 2006, and the victim eventually married Defendant. Ms. Graham acknowledged that the victim's sister had a problem with alcohol but testified that she did not know if the victim also had an issue with alcohol.

Ms. Graham confirmed that Defendant and the victim had divorced. She testified that the victim and Defendant were "not [married] very long" because Defendant "was violent."

In October of 2015, Ms. Graham lived in Fountain City. The victim also lived in Fountain City in an apartment with the victim's and Defendant's daughter. Ms. Graham and the victim had contact with each other "about every day."

Ms. Graham spoke with the victim around 7:30 p.m. on the night before she died. When Ms. Graham did not hear from the victim the next day, she called the victim's place of employment. Ms. Graham was informed that the victim did not show up for work.

Chris Morrison testified that he and the victim were married. He claimed the victim "picked up some negative peers" and "[a]t times" drank to excess. He testified that after he and the victim got married, he had to finish college but that the victim moved back to Knoxville to start working. Mr. Morrison recalled arguments in the early years of their marriage. The victim often became physical, especially when she had been drinking. He described her as "volatile" and irrational when alcohol was involved. The victim was even arrested in 2005 for assaulting Mr. Morrison and his mother. Despite the victim's tendency to abuse alcohol, Mr. Morrison described "good" periods of time during which the victim quit drinking.

Mr. Morrison and the victim shared custody of their children after the divorce in 2006. Mr. Morrison thought that the victim met Defendant sometime around 2012. She continued to drink after she met Defendant. Mr. Morrison described things as "really volatile" after the Defendant and the victim had a daughter.

During this period of time, Mr. Morrison took the victim to court several times in an attempt to "take away parenting time." Mr. Morrison explained that the couple's children would call him from the victim's house, and he would hear "screaming [and] yelling" between the victim and Defendant in the background. On cross-examination, Mr. Morrison described several incidents which occurred at the victim's house which he either overhead while on the phone with one of his children or about which his children later described to him. During these incidents, Mr. Morrison heard screaming and what he thought was fighting between the victim and Defendant. One of these incidents in September of 2014 culminated with Mr. Morrison filing a warrant to have the victim arrested for an assault on one of their daughters. During the incident, it was alleged that Defendant "made an inappropriate comment regarding [one of the children's] butt[s] . . . like, she had a nice ass or something." The victim was arrested, but the warrant was eventually dismissed.

After this incident, Mr. Morrison secured an order of protection prohibiting Defendant from having contact with Mr. Morrison's children. There was also an order of protection against the victim. As part of that order of protection, Mr. Morrison sought an emergency hearing in chancery court. Eventually, Mr. Morrison and the victim came to an agreement with regard to visitation. As part of this agreement, the victim was supposed to "do individual counseling" and eventually "participate in family therapy with a psychologist" with the ultimate goal of getting "more time" with the children. The victim also agreed not to drink alcohol for one year. Mr. Morrison thought Defendant complied with the order of protection but suspected that Defendant "was still hanging around" the victim's house. Mr. Morrison learned that the victim and Defendant were divorced in the spring of 2015.

Mr. Morrison testified that the victim seemed dedicated to working toward regaining visitation with her daughters. The victim progressed from no contact with the children to increased visitation with the children. However, in the summer of 2015, the children informed Mr. Morrison that they thought Defendant was coming around the victim's house again.

Elizabeth Guy worked at Beverly Park Place Health and Rehab, also known as Hillcrest North, as the social services director. Ms. Guy worked with the victim. Ms. Guy

described the victim as "sweet as pie" and "relieved" after her divorce from Defendant was final. Ms. Guy last saw the victim on the day prior to her death.

The next day, Ms. Guy was concerned when she learned that the victim did not show up for work. She "knew something was wrong" because the victim had not called to say that she would be late or absent from work. She recalled that the victim told her a year prior, "if I don't show up to work, you come find me, and you go to [Defendant]." She also recalled that the victim told her Defendant said she would be in a "body bag" if she ever left Defendant.

On the day the victim failed to show up for work, Ms. Guy called the police to perform a welfare check on the victim. After the welfare check, the police told her that there was nothing they could see to suggest foul play and that the family could report the victim missing after twenty-four hours. Ms. Guy informed the police that there was a two-year-old also missing. This information prompted the issuance of an Amber Alert.

David Malone, a social worker at Beverly Park Health and Rehab, also worked with the victim. He and the victim had gone on five or six dates prior to her death. Their relationship was physical, and they frequently exchanged text message with each other. Mr. Malone was concerned when the victim did not show up for work.

The records custodian for the Knox County Emergency Communications District 911, Michael Alan Mays, testified that there was a call from Defendant's address on October 28, 2015, at 11:00 a.m. This was the first call from that residence that year.

Sergeant Michael Perry of the Knoxville Police Department performed the welfare check at the victim's apartment on October 28, 2015. During the initial check, there did not appear to be any sign of forced entry, and there did not seem to be anything amiss when Sergeant Perry peered through the windows. Eventually, Officer Perry came back to the residence with another officer, Ryan Kuykendall. The officers entered the residence through an unlocked back door. Officer Perry found the victim "laying in [an upstairs] bedroom, obviously deceased, blood everywhere." There was a "towel covering her upper body from around her chest up over her head and face." Near the victim's body, police located a broken pink iPhone and the victim's black cell phone. Defendant's fingerprint was found on the black cell phone. Telephone records confirmed that there were several calls placed between the victim's and Defendant's phones on the evening of October 27.

A neighbor later reported that he saw Defendant driving the victim's car on the morning of October 28, and Defendant's van was found parked about 400 yards from the victim's apartment.

- 4 -

Defendant was arrested in Morrow County, Ohio on October 29 as a result of a tip related to the Amber Alert. He was driving the victim's car and had $305 in cash. A pair of blue jeans was taken from the car. The jeans contained a red stain. The couple's daughter was in the car with him unharmed.

The victim's debit card, for which she was the only signatory, was used at Walgreens on October 27 at 6:19 p.m. Surveillance video showed the victim and her daughter in the store. The account also had withdrawals of $300 at 8:33 a.m. on October 28 and two different $200 withdrawals on October 29 in Ohio. Photographs from these transactions on October 28 and 29 showed Defendant driving the victim's car during the account withdrawals.

According to the medical examiner, the victim was stabbed a total of 47 times. Of those stab wounds, several could have been fatal if rendered by themselves. The stab wounds included 16 wounds to the chest and upper abdomen, 17 stab wounds to the back, two stab wounds to the left lower abdomen, one stab wound to the right side of the neck, six stab wounds to the left side of the neck, two stab wounds to the top of the left shoulder, one stab wound on the left cheek, one stab wound to her left hand, and one stab wound to her left forearm. The victim also had a number of bruises, including defensive wounds. The medical examiner determined that the cause of death was multiple stab wounds. The medical examiner was unable to determine the time of the victim's death or whether the injuries were inflicted while the knife was moving or while the victim was moving.

The Tennessee Bureau of Investigation evaluated evidence taken from the scene and from the car Defendant was driving at the time of his arrest. Defendant's DNA was found under the victim's fingernails and his blood matched blood on tissues in bathroom in the victim's apartment. The jeans found in the car Defendant was driving at the time of his arrest contained blood matching the victim's DNA.

Investigator Michael Booker, the lead investigator, testified about his examination of the crime scene. He explained that because a "very high percentage of the blood [was] low" to the ground, it "led [him] to conclude that [the victim] was stabbed while she was on the ground."

FBI Special Agent Stephen McFall testified as a computer forensic examiner regarding cell phones found at the scene. He was unable to extract any data from the pink iPhone recovered at the scene because it was broken. Another phone, identified as a T-mobile phone used by the victim until October 15 contained several audio files.

Some of the audio files were played for the jury. During one of the audio files, the victim and Defendant can be heard arguing about food. Defendant accused the victim of

taking away food before he could eat it. The victim can be heard saying Defendant was "unwanted" at her home because they were "divorced." Defendant called the victim a "heartless whore" and told the victim she would not "have this place when [he was] done with [her]." In another recording, Defendant told the victim that he did not want their daughter around any men. Defendant threatened to "break" the victim's neck.

Special Agent McFall testified that there were numerous photographs on the phone but that none of the photographs contained Defendant. The State introduced a multitude of text messages between Defendant and the victim. In some of these messages, Defendant claimed that the victim had "no morals" and that she had a "drinking problem."

A Samsung phone belonging to Defendant was also analyzed by Special Agent McFall. On this phone, there were pictures of alcoholic drinks and quite a few pictures of a child. The web history on the phone included visits to sites about how to "burn your house down" and a biography.com entry for Casey Anthony. Special Agent McFall explained that Casey Anthony was the mother of a child killed in Florida who was later tried for the child's murder.[1]

Defendant's phone contained a multitude of "notes." The notes appeared to document incidents where the victim was drinking and/or violent. One entry, dated September 22, 2015, read: "She is drunk uncontrollably . . . and had four tramadols. . . . She stabbed me again with butter knife tonight. Third time in 14 months. My scars on back are more than enough proof." An October 6 note documents the victim's "daily" drinking and threats against Defendant. On another occasion, Defendant again mentions the victim's "daily" drinking and threats. Many of these text messages between the victim and Defendant spanning from to September of 2015 were read aloud to the jury. These messages had been deleted from Defendant's phone but were recovered using computer software. There were text messages discussing arrangements to see his and the victim's daughter. Defendant expresses repeated concern that the victim was dating someone else. There were several text messages during which the victim asked Defendant to leave her alone or stop contacting her. The victim also accused Defendant of failing to respect her boundaries. The final exchanges on October 27 include a request by Defendant to get his "stuff" and text messages about spending time with their daughter and asking to spend the night in "the girls room."

Special Agent McFall also recovered Facebook messages that were exchanged between the victim and Defendant using an app called Talkatone. There were multiple messages from Defendant in which he asked the victim if she was dating someone. In one

---

[1] Defense counsel objected to this testimony. The trial court ordered the jury to disregard the testimony about Casey Anthony.

- 6 -

message, the victim responded that she did not "have to prove anything" to Defendant because they were "DIVORCED PERIOD." The victim sent a message in which she asked Defendant to leave her alone. On October 25, Defendant told the victim he had no where to stay, and she replied that he could "not stay [at her house] period."

Defendant, who did not testify, put on proof including several stipulations. One of the stipulations provided that both Defendant and the victim were on the lease for the apartment. Another stipulation included information that a man named Bill Coker loaned Defendant money on occasion and actually loaned Defendant $40 on October 27.

Richard Guinn testified that he lived close to the parking lot at the veterinary clinic where Defendant's vehicle was discovered. He recognized Defendant and testified that he had seen him in the parking lot on more than one occasion. Defendant would park in the lot and wait on a "lady in a dark vehicle" to pick him up. Mr. Guinn thought that it was Defendant's wife that would pick him up.

At the State's request, the trial court dismissed the kidnaping and carjacking counts. The jury acquitted Defendant of felony murder but found Defendant guilty of premeditated first degree murder and especially aggravated robbery. After a bifurcated sentencing hearing, the jury could not agree on a sentence for the murder conviction. The trial court imposed a mandatory life sentence. After a separate sentencing hearing, the trial court sentenced Defendant to twenty-five years for the especially aggravated robbery conviction, to be served consecutively to the life sentence.

Defendant filed a timely motion for new trial. After a hearing, the trial court denied the motion and this appeal followed.

*Analysis*

*Change of Venue*

Defendant challenges various aspects of his conviction on appeal. We have reordered the issues to facilitate our discussion on appeal. One of the issues raised by Defendant is that the trial court erred in denying a motion for change of venue "in light of the overwhelming and prejudicial pre-trial publicity." The State argues that this issue was waived because Defendant failed to renew his motion for change of venue after voir dire

and because Defendant failed to provide a record demonstrating that he exhausted all of his peremptory challenges.[2]

Defendant filed a motion for change of venue. Prior to jury selection, the trial court issued an order on the motion. The trial court went through various factors to determine whether Defendant could receive a fair trial. After discussing the various factors, the trial court denied the motion determining that Defendant could receive a fair trial from a Knox County jury. The trial court noted that it would "conduct a case specific jury orientation with a venire dedicated solely to this case," instruct the jurors to avoid the media, and give jurors written questionnaires. The trial court also noted that Defendant could renew his request during or at the conclusion of the jury selection process.

At the beginning of voir dire, counsel for Defendant made 13 challenges for cause based solely on the responses to the jury questionnaire. One of these jurors had already been relieved by the trial court and the parties agreed to remove one other juror from the panel. The trial court reserved ruling on the remaining challenges for after voir dire. The trial court then permitted each of the lawyers to question possible jurors.

During initial questioning, the jury panel was asked if they had seen any media information about the case. One of the jurors commented that he or she saw an article about the case but did not read it. Another identified juror stated that he or she heard coworkers talking about the case.

After general questioning of potential jurors, the parties determined that seven of the potential jurors should be questioned individually. After extensive questioning, the parties agreed that four of those jurors could not be rehabilitated. The trial court then went through seven rounds of peremptory challenges before seating a jury of twelve with two alternates. From the record, it is not clear how many peremptory challenges were used by each party. At the conclusion of jury selection, counsel for Defendant and counsel for the State indicated their approval of the jury.

In general, a criminal defendant must be tried in the county where the offense was committed. Tenn. R. Crim. P. 18(a). However, a trial court may order a change of venue "when a fair trial is unlikely because of undue excitement against the defendant in the county where the offense was committed or for any other cause." Tenn. R. Crim. P. 21(a). When a defendant seeks a change of venue he or she "shall" file a motion "at the earliest date after which the cause for the change of venue is alleged to have arisen" pursuant to

---

[2] After the initial technical record was filed in this Court, the record was supplemented to include void dire. Despite the State's argument and supplementation of the record, Defendant failed to add to his argument on venue even in his reply brief.

Tennessee Rule of Criminal Procedure 21(c). If a defendant fails to "take whatever action was reasonably available," the issue is waived. Tenn. R. App. P. 36(a); *see also State v. Rick Hanebutt*, No. W2005-01301-CCA-R3-CD, 2005 WL 2818240, at \*10 (Tenn. Crim. App. Oct. 2, 2006), *perm. app. denied* (Tenn. Feb. 26, 2007).

The decision whether to grant a defendant's motion for change of venue rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *State v. Sexton*, 368 S.W.3d 371, 387 (Tenn. 2012); *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993). "The mere fact that jurors have been exposed to pretrial publicity will not warrant a change of venue," nor will prejudice "be presumed on the mere showing of extensive pretrial publicity." *State v. Rogers*, 188 S.W.3d 593, 621 (Tenn. 2006) (internal citations omitted). "[I]n order to obtain relief on a claim that the trial court improperly denied a motion for a change of venue, a 'defendant must demonstrate that the jurors who actually sat were biased or prejudiced against him.'" *Sexton*, 368 S.W.3d at 387 (quoting *Rogers*, 188 S.W.3d at 621).

The factors which a trial court should consider in deciding whether to grant a change of venue include:

> the nature, extent, and timing of pretrial publicity; the nature of the publicity as fair or inflammatory; the particular content of the publicity; the degree to which the publicity complained of has permeated the area from which the venire is drawn; the degree to which the publicity circulated outside the area from which the venire is drawn; the time elapsed from the release of the publicity until the trial; the degree of care exercised in the selection of the jury; the ease or difficulty in selecting the jury; the venire persons' familiarity with the publicity and its effect, if any, upon them as shown through their answers on voir dire; the defendant's utilization of his peremptory challenges; the defendant's utilization of challenges for cause; the participation by police or by prosecution in the release of the publicity; the severity of the offense charged; the absence or presence of threats, demonstrations, or other hostility against the defendant; the size of the area from which the venire is drawn; affidavits, hearsay, or opinion testimony of witnesses; and the nature of the verdict returned by the trial jury.

*Sexton*, 368 S.W.3d at 387 (citing *Rogers*, 188 S.W.3d at 621-22 (appendix) (citing *State v. Hoover*, 594 S.W.2d 743, 746 (Tenn. Crim. App. 1979))).

Defendant does not address these factors in his brief. Rather, he makes a blanket statement that the "abundance of coverage of [Defendant's] alleged crime" made it a situation where a change of venue was appropriate. The record contains several articles

and news clipping that reflect the nature, extent, and timing of the pretrial publicity, the degree to which the publicity permeated the area from which the venire was drawn, and the time elapsed between the release of the publicity and the trial. It appears that most of the media coverage was concentrated around the time of the victim's death and related to the Amber Alert and/or custody of the victim's daughter. The potential jurors completed questionnaires regarding the pretrial publicity, and the answers on the questionnaires indicated that several jurors were aware of the case prior to trial.

The record reflects that the trial court carefully and meticulously led the jury selection process to ensure that Defendant received a fair trial. *See Hoover*, 594 S.W.2d at 746. The record reflects that Defendant exercised some of his peremptory challenges. However, Defendant failed to establish that any members of the jury were biased from exposure to pretrial publicity or any pretrial knowledge of the case or the witnesses. *See Sexton*, 368 S.W.3d at 388 (concluding that the trial court did not abuse its discretion in denying a change of venue motion when there was no indication that the pretrial publicity adversely impacted the jury panel); *Evans*, 838 S.W.2d at 192 (concluding that the defendant did not demonstrate prejudice when the jurors who had been exposed to pretrial publicity stated that they would render a verdict based on the evidence at trial).

We also note that Defendant acquiesced to the jury panel at the conclusion of jury selection. Further, Defendant failed to renew his motion for change of venue. *See Rick Hanebutt*, 2006 WL 2818240, at *10 (concluding that the defendant waived appellate review of the trial court's denial of his motion for a change of venue because the defendant failed to renew his motion during jury selection as instructed by the court's pretrial order initially denying a venue change). Moreover, Defendant does not point to any specific instances of prejudice in the record that would have precluded him from receiving a fair trial. The trial court did not abuse its discretion in denying the motion to change venue. Defendant is not entitled to relief on this issue.

*Prior Bad Acts*

Defendant argues on appeal that the trial court committed plain error by "admitting explosive but irrelevant allegations" against Defendant including a statement made by Defendant about his stepdaughter's body and his web history about arson. Defendant acknowledges that the issues are only reviewable for plain error because he failed to object to the testimony about his statement about his stepdaughter and failed to raise the web history issue in his motion for new trial but insists that he is entitled to relief because "admission is barred by the rules of evidence." The State disagrees, arguing that there was no breach of a clear and unequivocal rule of law.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Where the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, it may be inadmissible. Tenn. R. Evid. 403. However, "[e]vidence of other crimes, wrongs, or acts" is inadmissible character evidence if offered to show a defendant's "action in conformity with [a] character trait." Tenn. R. Evid. 404(b); *State v. Parton*, 694 S.W.2d 299, 654 (Tenn. 1997). "The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime." *State v. McCary*, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003) (citing *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994)). Yet, such evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme" or "contextual background." *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013). Other act evidence may be admitted for these purposes only after the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). However, "[t]rial courts have been encouraged to take a restrictive approach of Rule 404(b) because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014) (internal quotation and citation omitted).

A trial court's decision to admit or exclude evidence under Rule 404(b) is reviewed under an abuse of discretion standard if the trial court has substantially complied with the procedure mandated by the Rule. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). Where the trial court has failed to substantially comply with the procedural dictates of Rule 404(b), the standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-653)). "A court abuses its discretion when it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results

in injustice to the complaining party." *Jones*, 450 S.W.3d at 892 (internal quotation and citation omitted).

Defendant first contests the trial court's admission of his statement, through the testimony of Mr. Morrison, that his stepdaughter had a nice behind. Mr. Morrison was explaining what led to the order of protection against Defendant and the victim. Defendant did not object to this testimony. Defendant also complains about the introduction of "prejudicial" material from his web history including website called, "How can I burn my house down and make it look like an accident?" This issue was not in Defendant's motion for new trial.

In criminal cases, the doctrine of plain error permits appellate courts to consider issues that were not raised in the trial court. Tennessee Rule of Appellate Procedure 36(b), the plain error doctrine, states in part that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." It is well-settled that the discretionary authority to invoke the plain error doctrine should be "sparingly exercised," *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), because "appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them." *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)).

To determine whether a trial error rises to the level of justifying "plain error" review, we look to the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *State v. Bishop*, 431 S.W.3d 22, 44 (Tenn. 2014). Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Defendant's brief generally addresses the plain error factors. However, Defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). With regard to the statements about Defendant's stepdaughter, we refuse to entertain a plain error analysis because Defendant has failed to show that the issue was not waived for tactical reasons. In his brief, Defendant does not explain why no objection was lodged. Therefore, Defendant has not carried his burden of persuasion with regard to his statements about his stepdaughter. With regard to the introduction of Defendant's web history, we can find no breach of a clear and unequivocal rule of law. In our view, this evidence was relevant to Defendant's state of mind and intent to commit the acts for which he was on trial. Because Defendant cannot establish all five factors necessary for plain error, he is not entitled to relief on this issue.

*Hearsay Statement*

Defendant also complains about the introduction of a hearsay statement during the testimony of Elizabeth Guy. Specifically, Defendant argues that Ms. Guy should not have been able to testify that Defendant told the victim she would be in a "body bag" if she ever left him. Defendant admits that he failed to object to the testimony at trial and, as a result, the issue is reviewable only under plain error. The State argues that the statement was not hearsay because it was not offered for the truth of the matter asserted, but rather to show that the victim feared Defendant.

As noted above, plain error review permits appellate courts to consider issues that were not raised in the trial court. Tenn. R. App. P. 36(b). Also, previously noted is how an alleged error rises to a level that justifies plain error review.

At the outset, we note that "rarely will plain error review extend to an evidentiary issue." *State v. Jonathan Mitchell Grimes*, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007), *no perm. app. filed*), *no perm. app. filed*.

As noted earlier in this opinion, Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible. Tenn. R. Evid. 402. However, it may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice[.]" Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d

947, 951 (Tenn. 1978). "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Biggs*, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)).

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this Court. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

In our view, the evidence at issue, a statement by the victim to a friend about Defendant's threat was not admitted for the truth of the matter asserted. It was admitted to show that the victim was afraid of Defendant and to rebut the defense theory that Defendant and the victim were still in a relationship despite their divorce. Because the statement was not admitted for the truth of the matter asserted, it was not hearsay. Therefore, the trial court did not breach a clear and unequivocal rule of law. Because all five factors for plain error cannot be established, Defendant is not entitled to relief on this issue.

*Crime Scene Photographs*

Defendant complains that the trial court "erred in admitting gruesome crime scene photographs of the [victim's] body which did not serve to address any disputed issue." Specifically, Defendant complains that the State introduced over two hundred crime scene photographs including seven photographs, labeled Exhibits 110, 111, 112, 115, 139, 155, and 159. The exhibits depicted the victim's "bloodied body and face." Defendant argues that because the victim's manner of death was not disputed and there was ample testimony about the crime scene from witnesses, the photographs were not relevant and only served to inflame the jury. The State insists that Defendant has waived review of Exhibits 110 and 111 for failing to challenge them in a pretrial motion and, in any event, the trial court did not err in admitting the photographs.

Prior to trial, Defendant filed a motion in limine challenging the introduction of nine of the crime scene photographs. At the hearing on the pretrial motions, counsel for Defendant noted that of the 249 pictures of the crime scene, 32 of those pictures depicted the victim's body. Of those 32, Defendant objected to the introduction of nine of those photographs, initially identified by number as 2474, 2478, 2479, 2512, 2551, 2574, 2582, 2585, and 2586. It does not appear that Defendant challenged the introduction of numbers

2469 or 2470. After the hearing, the trial court issued a written order with regard to the admissibility of the photographs. The trial court's order excluded one of the photographs as duplicative, determining:

> Each of the photographs in question are clear and accurate. The body is generally in the same position as found, although some show a different position. All of the [photographs of the scene] contain varying degrees of blood coverage. Some depict a large amount of blood on and around the alleged victim's body. But, none show closeup or gruesome wounds. The case involves 47 separate stab wounds. So, it is difficult to find any photo that does not contain bloody images. The position of the body may be material to some degree. The primary issue in the case will be who was the first aggressor. Therefore, proof regarding this issue will have a higher degree of probative value than proof regarding extraneous issues.
>
> Photo 2474 shows the right side of the alleged victim's body in totality with a prescription card purportedly belonging to the defendant. This image is probative of identity and any danger of unfair prejudice does not substantially outweigh this probative value. The court finds this photo to be admissible.
>
> Photo 2478 depicts a closeup of the victim's right arm, face, and upper torso. The State wishes to use this photo to show that her face was bloody and that she had taken off her makeup. This is relevant to time of death. The court finds the photo to be probative of time of death and any danger of unfair prejudice does not substantially outweigh this probative value. The court finds this photo to be admissible.
>
> Photo 2479 is similar to photo 2474. It is a close-up on the alleged victim's upper torso, the State argues that this photo shows the smearing of blood on the alleged victim's skin which is indicative of a struggle. The court finds that this photo does not add any additional evidence than presented in photo 2474. Therefore, this photo is excluded on the grounds of being duplicative. The State may elect to use this photo instead of 2474 if they prefer.
>
> Photo 2512 depicts the left side of the alleged victim's face and her upper torso. The State argues that this photo shows the pooling of blood in the victim's ear to establish the final resting position. The court finds the photo to be probative of this issue and any danger of unfair prejudice does not substantially outweigh this probative value. This photo is admissible.

- 15 -

Photo 2551 depicts a closeup of the alleged victim's left arm in a down position and her face and upper torso. The State argues that this photo captures an image of jewelry that appears to have been dropped on her body after death. The court finds the photo to be probative of actions by her killer after her death and any danger of unfair prejudice does not substantially outweigh this probative value. This photo is admissible.

Photo 2574 depicts the lower half of the alleged victim's body with blood smeared over her legs. This is the only photograph of the front of the alleged victim's legs that the State is seeking to introduce. The court finds this photograph to be probative of the nature of the incident in that the alleged victim ended up with many wounds that bled over her body and was smeared across all of her body. The court finds this probative value is not substantially outweighed by the danger of unfair prejudice. This photo is admissible.

Photo 2582 depicts the alleged victim's back and the wounds she received in her back. This is probative to the issue of first aggressor. The court finds this probative value is not substantially outweighed by the danger of unfair prejudice. This photo is admissible.

Photo 2585 depicts the alleged victim's lower back and wounds she received that are not depicted in photo 2582. This is also probative to the issue of first aggressor. The court finds this probative value is not substantially outweighed by the danger of unfair prejudice. This photo is admissible.

Photo 2586 depicts the back of the victim's head and it appears her hairs is soaked in blood. The State argues it also shows the jewelry that was tangled in her hair. This is perhaps the most bloody of the images. However, it is probative of time of death and first aggressor. Therefore, the court finds this probative value is not substantially outweighed by the danger of unfair prejudice. This photo is admissible.

At trial, the State introduced a multitude of photographs. Counsel for Defendant renewed his objection to the introduction of the challenged photographs. The trial court made the following comments in a jury-out hearing after the introduction of the photographs:

All right. Since there has been an objection to some of these photos, the Court made a point of observing the jury during the presentation of the photos to see how their reactions were. They all appeared stoic. The only movements I saw is [ ], number two, he had his hand on his face a lot. I think he's actually been like that through much of the trial, though. So I didn't really think that was any reaction to the pictures. [Female Juror P] is the only one that I saw with any reaction. A few times when body pictures were shown, she would put her hand up to her mouth or her face. It appeared to be sort of in a subconscious or involuntary reaction during those. She didn't appear upset. Nobody was crying or nobody looked away. That's the only thing that I saw, was any if anybody else wants to put anything else on the record about the presentation of photos. All movements by any of them. That was [Female Juror P]. She seemed okay. She was actually yawning at the end of it but that's all I could observe. I don't know.

In *Banks*, our supreme court provided the trial courts with guidance for determining the admissibility of relevant photographic evidence. The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions. *Id.* at 951. The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion. *Carruthers*, 35 S.W.3d at 576-77; *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *Banks*, 564 S.W.2d at 949. As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility. *Carruthers*, 35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

On appeal, Defendant challenges the introduction of Exhibits 110 (thumbnail number 2469), 111 (thumbnail number 2470), 112 (thumbnail number 2474), 115 (thumbnail number 2478), 139 (thumbnail number 2512), 155 (thumbnail number 2551), and 159 (thumbnail number 2586). Defendant did not challenge the introduction of Exhibits 110 or 111 in the pretrial motion or in the motion for new trial. Moreover, in the motion for new trial, Defendant did not challenge the admissibility of specific photographs, but rather introduction of crime scene and autopsy photographs of the victim in general.

The State argues that Defendant waived any issue with regard to the admission of exhibits 110 and 111 for failure to challenge their admission in the motion in limine and the motion for new trial. However, counsel for Defendant noted their objection to the admissibility of the photographs at trial and in the motion for new trial in a blanket

objection without specifying certain photographs.  In our view, the issue was preserved for appeal.

Having reviewed the trial court's analysis regarding each individual photo, we conclude that the trial court did not abuse its discretion in admitting the photos into evidence.  The photos at issue include various photographs of the victim as she was found in her apartment.  The trial court found that the photos showed evidence of a struggle, the amount of blood involved, the number of the injuries, a medical card, and the general state of the scene.  In its detailed pretrial rulings, the trial court excluded one photograph on the basis that it was duplicative.  The trial court also observed the demeanor of the jury as they viewed the photographs.

Our review of the record shows that the trial court methodically considered the probative value and prejudicial effect of each crime scene photo.  The trial court ruled the photographs admissible because it found that they were relevant to the issues on trial, notwithstanding their gruesome and horrifying character.  The victim was stabbed 47 times.  The photographs depicted both the nature and extent of her injuries in addition to the signs of a struggle prior to the victim's death.  The trial court did not abuse its discretion.  We conclude that Defendant is not entitled to relief on this issue.

*Sufficiency*

Defendant challenges the sufficiency of the evidence with respect to both of his convictions.  Specifically, with respect to the conviction for first degree murder, Defendant alleges that there was no proof of premeditation.  To the contrary, Defendant argues that this was a "crime of anger and rage" and that he "acted out of passion."  Additionally, Defendant insists that there was no proof to establish that Defendant used violence to take the victim's ATM card.  Defendant thus argues the evidence was insufficient to support the conviction for especially aggravated robbery.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence.  A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt.  *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).  As such, this Court is precluded from re-weighing or

- 18 -

reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). This Court considers all of the evidence presented at trial, even if Defendant challenges the admissibility of some of the evidence on appeal. *See State v. Thomas Bolton*, No. W2012-02000-CCA-R3-CD, 2014 WL 12653829, at *10 (Tenn. Crim. App. Jan. 31, 2014) (citing *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981)), *no perm. app. filed*. Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Here, Defendant was charged with first degree murder. In relevant part, first degree murder is "[a] premeditated and intentional killing of another." T.C.A. §39-13202(a)(1). Tennessee Code Annotated §39-13-202(d) defines premeditation as:

> An act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

The State must establish the element of premeditation beyond a reasonable doubt. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Premeditation may be proved by circumstantial evidence. *See, e.g.*, *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). The existence of premeditation is a question of fact for the jury and may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000). Such circumstances include, but are not limited to, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, threats or declarations of an intent to kill, a lack of provocation by the victim, failure to aid or assist the victim, the procurement of a weapon, preparations before the killing for concealment of the crime, destruction and secretion of evidence of the killing, and calmness immediately after the killing. *State v. Kiser*, 284 S.W.3d 227, 268 (Tenn. 2009); *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *State v. Davidson*, 121 S.W.3d 600, 615 (Tenn.

- 19 -

2003); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013).

Especially aggravated robbery is robbery, as defined in Code section 39-13-401, which is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a) (2014). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear. *Id.* § 39-13-401(a) (2014). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." *Id.* § 39-14-103(a). "A robbery can involve the taking of property from the physical body of a person, in which a person has actual possession of the property, or from a person's immediate presence or the general area in which the victim is located, in which the person has constructive possession of the property." *State v. Tolbert*, 507 S.W.3d 197, 217 (Tenn. Crim. App. 2016) (citations omitted); *see State v. Edmondson*, 231 S.W.3d 925, 928 (Tenn. 2007) ("The words 'from the person of another' indicate that the property is in close physical proximity to the victim when the property is taken.").

In the light most favorable to the State, the evidence shows that Defendant used some sort of deadly weapon to stab the victim 47 times and then used her debit card several times over the next few days. Nothing at the scene indicated that the victim had any type of weapon during the attack. To the contrary, the victim had defensive wounds on her left hand and forearm in addition to her stab wounds. Defendant had scratches on his face and neck at the time of his arrest. The victim had Defendant's DNA under her fingernails, indicating that she likely scratched Defendant during the attack in an attempt to defend herself. The autopsy concluded that the victim died as a result of multiple stab wounds and that there was no evidence of attempted resuscitation. There was testimony about the volatile nature of the relationship between Defendant and the victim. While they were divorced, Defendant continued to contact the victim via text message about matters other than the shared custody of their daughter. There was even evidence that Defendant threatened to break the victim's neck if she allowed another man around their daughter. Defendant's theory was that he acted "out of a passion that precluded premeditation." However, the jury heard the evidence and the definition of premeditation, and determined that Defendant's actions were premeditated.

With respect to the conviction for especially aggravated robbery, Defendant argues that there was no proof he used violence to take the victim's debit card. To the contrary, the proof shows that the victim used the debit card at Walgreens at 6:19 p.m. on the night she was murdered. After her death, Defendant took the victim's car and daughter on the run. Defendant used the victim's debit card several times over the course of the next two days to take $500 from her account. It was within the province of the jury to determine

that Defendant took the debit card either from the victim's person or her apartment and that the victim suffered serious bodily injury. The evidence was sufficient to support Defendant's convictions.

*Improper Prosecutorial Argument*

Defendant argues that the State made improper closing argument that relied on "invective, conjecture, misstatements, references outside the record, and appeals to emotion." Specifically, Defendant complains about the prosecutor: (1) calling Defendant a "leech" and "coward"; (2) making irrelevant accusations about Defendant's relationship with his other daughters; (3) speculating on how the victim's phone was broken, where Defendant was heading, and actions Defendant took after the victim was killed; (4) making arguments outside the record about the "classic pattern" of domestic violence; (5) denigrating the defense; and (6) pleading to the jury for "vengeance." Defendant acknowledges that he did not contemporaneously object to each instance of alleged improper argument at trial and points to each allegation that was raised in the motion for new trial. The State points out that Defendant failed to object to many of the statements about which he complains on appeal and failed to include many of the statements about which he now complains in his motion for new trial. Therefore, the State argues that Defendant has waived all but one challenge to the closing argument and that Defendant is not entitled to relief on that one issue.

Defendant argues that "several" of his claims were preserved by contemporaneous objection and/or inclusion in the motion for new trial. Specifically, Defendant acknowledges, and the record confirms, that he failed to object when the prosecutor referred to Defendant as a "leech" and a "coward" at trial, but included a complaint about being referred to as a "coward" in his motion for new trial. Defendant objected to a statement about his "demeanor" in the back of the police cruiser as "chuckling, laughing" but failed to raise this issue in his motion for new trial. With regard to speculation, Defendant challenges statements by the prosecutor about what may have happened to the victim's phone, coffee, ironing board, and/or Defendant's plan to go to Canada on appeal. However, there were no objections made at trial with regard to these statements and only the statements related to the iPhone and Defendant's alleged flight to Canada were included in the motion for new trial. With regard to arguments made by the prosecutor that were beyond the scope of the record, Defendant complains about the prosecutor's reference to "classic" domestic violence patterns and the lack of wounds on Defendant's hands. Neither of these were objected to at trial nor included in the motion for new trial. Defendant also challenges the prosecutor's "dramatic demonstration" during which the prosecutor counted from one to forty-seven while pounding on counsel table to characterize how long it took Defendant to stab the victim. While there was no objection to this argument at trial, it was included in the motion for new trial. Defendant also failed to object to what he perceived

- 21 -

as "[d]enigration of defense" when the prosecutor insinuated that Defendant should get a "gold star" for the brutality of the killing by giving Defendant a "pass on premeditation" and consider the lack of defensive wounds as signs that the killing did not happen in a "wild rage." Defendant also failed to object to the prosecutor's request to show Defendant "the same amount [of mercy] that he showed" to the victim. It appears that the only complaint to the prosecutor's argument that was both objected to at trial and raised in the motion for new trial related to remarks made by the State about the absence of proof of Defendant's relationship with his other two daughters.

Our supreme court has stated "that it is incumbent upon defense counsel to object contemporaneously whenever it deems the prosecution to be making improper argument." *State v. Jordan*, 325 S.W.3d 1, 57 (Tenn. 2010). A timely objection gives the trial court the opportunity to assess the State's argument and to take appropriate curative action. *Id.* at 57-58. Failure to contemporaneously object constitutes a waiver of the issue on appeal. *Id.*

Defendant argues that despite his failure to object to all the instances of alleged prosecutorial misconduct, his inclusion of those issues in a motion for new trial is sufficient to preserve the issues for plenary review. Defendant cites to *State v. Hawkins*, 519 SW.3d 1, 48 (Tenn. 2017), and *State v. Zackary James Earl Ponder*, No. M2018-00998-CCA-R3-CD, 2019 WL 3944008, at *11-12 (Tenn. Crim. App. Aug. 21, 2019), *perm. app. denied* (Tenn. Dec. 5, 2019), to support his argument that plenary review is appropriate. However, both *Hawkins* and *Zackary James Earl Ponder* are distinguishable because they generally involved the prosecutor's use of information in closing argument that was objected to pretrial, which was determined to have sufficiently preserved the issue for appellate review. Moreover, this Court recently reiterated the requirement of a contemporaneous objection during closing argument in order to preserve an issue for plenary review. *State v. Edward Walsh*, No. M2019-00989-CCA-R3-CD, 2020 WL 5117960, at *11 (Tenn. Crim. App. Aug. 31, 2020), *perm. app. granted* (Tenn. Jan. 15, 2021), *appeal dismissed* (Apr. 13, 2021). Therefore, with the exception of one issue, Defendant's claims may only be reviewed for plain error.

As to the remainder of Defendant's complaints about the prosecutor's closing argument, we will review them under plain error only. When an issue is waived, we are limited to plain error review. *Id.* As stated previously, all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. *Bishop*, 431 S.W.3d at 44. Even if all five factors are present, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Id.* (quoting *Adkisson*, 899 S.W.2d at 642).

Defendant bears the burden of persuading this Court that the trial court committed plain error and that the error probably changed the outcome of the trial. *See State v. Martin*, 505 S.W.3d 492, 505 (Tenn. 2016). Defendant has failed to show that the issues were not waived for tactical reasons. In his brief, Defendant does not explain why no objection was lodged. This Court can contemplate multiple tactical reasons that would explain why defense counsel may have consciously chosen not to object to the prosecutor's closing argument, and none of those reasons were dispelled in Defendant's brief. Therefore, Defendant has not carried his burden of persuasion, and he is not entitled to relief on the issues that were not properly preserved for appeal.

The sole remaining challenge to allegedly improper argument that was both objected to and raised in a motion for new trial was Defendant's complaint about the prosecutor's remarks about Defendant's other two daughters. Consequently, Defendant's solitary issue with regard to prosecutorial misconduct that is preserved for appeal relates to the following comments made by the State during closing argument:

> [The victim's daughter is] the only thing he has. He's getting weaker 'cause she's the only thing he has. He's got a tattoo on his back with the name Hannah, and he's got another daughter Campbell, and does he ever express to [their mother's] "Oh, I need to spend time with Hannah. I really miss her - - miss her. I want to hug Hannah. Can I come over and hug - - no he doesn't.

After counsel for Defendant objected and the trial court overruled the objection, the prosecutor immediately referred to the overwhelming number of text messages sent by Defendant and the lack of references to his other two daughters. On appeal, Defendant argues that these statements were irrelevant and not supported by the record. The State argues that any error by the argument was minimized by the overwhelming proof of Defendant's guilt.

"Closing argument is a valuable privilege that should not be unduly restricted." *State v. Stephenson*, 195 S.W.3d 574, 603 (Tenn. 2006) (citing *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001)). The trial court has substantial discretion in controlling the course of arguments and will not be reversed unless there is an abuse of that discretion. *Id.* In addition, prosecutorial misconduct does not constitute reversible error absent a showing that it has affected the outcome of the trial to the prejudice of the defendant. *Id.* (citing *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001)). However, an attorney's comments during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007) (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). In order to be entitled to relief on appeal, the defendant must "show

that the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996).

Although not exhaustive, Tennessee courts have recognized five general areas of potential improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *See State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

This Court must consider the following factors when determining whether the argument of the prosecutor was so inflammatory or improper to negatively affect the verdict:

> (1) the conduct complained of viewed in the light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper arguments; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength and weakness of the case.

*State v. Chalmers*, 28 S.W.3d 913, 917 (Tenn. 2000) (citations omitted). In our view, it is unlikely that prosecutor's brief comments about Defendant's other daughters adversely affected the verdict. Such statements, while straight out of left field, did not diminish the unchallenged fact that Defendant stabbed the victim 47. times. As such, Defendant is not entitled to relief on this issue.

*Jury Instructions*

Defendant argues that the trial court erred by refusing to instruct the jury on the "legally correct" definition of passion. Specifically, Defendant argues that he requested the trial court to instruct the jury that passion meant "any of the human emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection." When the trial court denied the request, Defendant argues that the jury was unable to consider Defendant's emotions as a "viable defense to first-degree murder." Defendant cites *State v. Bullington*, 532 S.W.2d 556, 559-60 (Tenn. 1976), to support his argument. The State argues that the issue is waived for failing to include both the written charge and the transcript of the charge.

Defendant filed a written request for a jury instruction on the definition of passion. According to the record, the trial court refused to give the instruction. Of course, "a defendant has a right to a correct and complete charge of the law," *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001), and the trial court has the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). Tennessee law, however, does not mandate that any particular jury instructions be given, so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicially erroneous "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). Whether the trial court properly instructed the jury is a mixed question of law and fact. *State v. Thorpe*, 463 S.W.3d 851, 859 (Tenn. 2015); *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001). Accordingly, the standard of review is de novo with no presumption of correctness.

Defendant properly submitted a written request for a jury instruction on passion pursuant to Rule 30 of the Tennessee Rules of Criminal Procedure. However, the record on appeal contains only the written jury instructions. While the written jury instructions do not contain an instruction on passion, Defendant failed to submit a transcript of the jury instructions as part of the record on appeal. Rule 24(b) of the Tennessee Rules of Appellate Procedure provides that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." This Court has previously cautioned that

> [f]ailure to include a transcript normally waives review of appellate issues pertaining to jury instructions because without a complete record, it is impossible for this court to discern whether the written jury instruction conforms to the instructions as read to the jury and thus, whether error actually occurred. *See* Tenn. R. App. P. 24(b); *State v. Jones*, 623 S.W.2d 129 (Tenn. Crim. App. 1981).

*State v. Dedonnas R. Thomas*, No. W2000-01465-CCA-R3-CD, 2002 WL 1558687, at *7 (Tenn. Crim. App. Jan. 30, 2002), *no perm. app. filed*; *see also State v. Andrew Douglas Rush*, No. M2009-02253-CCA-R3-CD, 2010 WL 4868086, at *7 (Tenn. Crim. App. Nov. 29, 2010), *perm. appeal denied*, (Tenn. Apr. 13, 2011); *State v. Walter Wilson*, No. W2001-01463-CCA-R3-CD, 2002 WL 31259461, at *5 n.2 (Tenn. Crim. App. Sept. 4, 2002), *perm. app. denied* (Tenn. Jan. 27, 2003); *State v. Thomas Mitchell*, No. W1998-00509-CCA-R3-CD, 1999 WL 1531758, at *4 n.2 (Tenn. Crim. App Dec. 20, 1999), *perm. app. denied* (Tenn. June 12, 2000). Absent plain error, Defendant is not entitled to relief. Tenn.

R. App. P. 36. Defendant cites *State v. Bullington*, 532 S.W.2d 556, 559-60 (Tenn. 1976), to support his argument that the definition of passion was required by the trial court but notes that the *Bullington* definition of passion was later declared unnecessary by *State v. Mann*, 959 S.W.2d 503, 522 (Tenn. 1997). Defendant has pointed to no unequivocal rule of law that has been breached; there is no plain error.

### Cumulative Error

Defendant's last argument is that cumulative error by the trial court necessitates a new trial. Because we have found no error in the trial court's judgments, Defendant is not entitled to relief on this issue. *See State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010).

### Conclusion

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE